**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 2:26-cr-36(1)** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | |
| **DURIAN RANDELL WILLIAMS,** | : | |
| | : | |
| **Defendant.** | : | |

**OPINION & ORDER**

This matter is before the Court on Durian Williams's Motion to Suppress. (ECF No. 45). For the reasons set forth herein, the Motion is **DENIED**.

## I. BACKGROUND

### A. Factual Background

This case arises from a traffic stop that occurred on Interstate 71 in Franklin County on April 22, 2025. (ECF No. 45 at 2). On that day, Ohio State Highway Patrol Trooper Tyler Boetcher observed and subsequently pulled over a gray Ford F-150 that was allegedly driving 74 miles per hour in a 65 miles per hour zone, with out-of-state license plates. (*Id.* at 2; ECF No. 54 at 4). The car was driven by Robert Joe, who was accompanied by Defendant Durian Williams ("Defendant" or "Williams") in the passenger seat. (ECF No. 45 at 2). According to the Government, the Drug Enforcement Administration (DEA) Columbus District Office had been assisting another DEA office in an ongoing investigation into Defendant Williams. (ECF No. 54 at 3).

In February 2025, law enforcement allegedly observed Williams at a residence with a known drug trafficker. (*Id.*). After leaving the residence, Williams proceeded to John Glenn International Airport in Columbus, where officers attested that they observed Williams check into his flight to Houston, check a bag, and depart from the airport without boarding the flight. (*Id.*).

The Government contends that law enforcement officers believed that the luggage checked by Williams was a "ghost bag" used to traffic drugs. Accordingly, the DEA issued administrative subpoenas to multiple airlines requesting flight watch information on Williams. (*Id.*).

Williams contends that the Government's "ghost bag" theory is completely fictional. (ECF No. 45 at 10). According to Williams, after checking his bag to ensure it made it on the flight due to him running late, he left the airport to return his rental car but ended up missing his flight. He then boarded a later flight, arrived in Houston four hours later than planned, and picked up the bag from the airline. (*Id.*).

Despite the competing narratives, this February 2025 incident is what led to the events at issue in this Motion. Due to the airline subpoenas, DEA agents received notice from United Airlines that Williams was flying that day from Houston to Cincinnati/Northern Kentucky International Airport (CVG). (*Id.* at 3). Thus, the agents contacted CVG Airport police in addition to two state law enforcement officers – Trooper Tyler Boetcher, an Ohio State Highway Patrol (OSHP) Trooper and Deputy Patrick Gunnell, a certified K9 handler with the Franklin County Sheriff's Office (FCSO) to assist their surveillance. (*Id.*). When Williams arrived at CVG, officers observed him deplaning and watched him get picked up by a gray Ford F-150. (*Id.* at 4). Williams then placed two pieces of luggage in the bed of the truck, entered the passenger seat, and departed. CVG officers conveyed what they observed to the DEA Columbus agents who passed on the description of Williams and the vehicle to Trooper Boetcher and Deputy Gunnell who were positioned on I-71 slightly south of Columbus in Grove City. DEA Columbus agents also confirmed through a prior court-authorized request for cellular location that Williams arrived at the CVG airport and was traveling northbound on I-71. (*Id.*).

At approximately 7:00 p.m., Trooper Boetcher observed the gray Ford F-150 pickup traveling northbound at 74 miles per hour in a posted 65 miles per hour zone. (*Id.*). Trooper Boetcher then activated his overhead emergency lights and initiated a traffic stop. Deputy Gunnell subsequently arrived on scene within the first minute of the traffic stop. (*Id.*). After the driver pulled the vehicle over, Trooper Boetcher approached the passenger-side window and requested driver's licenses, registration, and insurance. (Jt. Ex. 2, 1:48). Both men produced Texas licenses, prompting Trooper Boetcher to ask, "what brings you all the way up this way?", to which Williams replied that they were travelling to meet up with some girls. (*Id.* at 2:04–2:12). Trooper Boetcher informed the men that they were pulled over for speed and then requested that Mr. Joe exit the vehicle to talk further behind the vehicle. (*Id.* at 2:50–2:55). Joe informed Trooper Boetcher they had driven from Houston the day before and were traveling to meet up with some girls. (*Id.* at 3:14–3:24). Joe attested that they had left Houston the night before, were taking turns driving, and had stopped a couple of times along the way to nap. (*Id.* 3:25–5:02). Joe also told Trooper Boetcher that the luggage in the back of the truck belonged to both men. (*Id.* at 3:48–3:58). Trooper Boetcher then placed Joe in the back of his cruiser while he went to question Williams who remained in the passenger seat. (*Id.* 4:57–5:02).

Alternatively, Williams informed Trooper Boetcher that Joe, who had driven from Texas, had just picked him up from the airport. (*Id.* at 5:30–7:00). Williams also attested that both pieces of luggage in the back of the truck belonged to him. (*Id.* at 615–6:30). Trooper Boetcher then ordered Williams out of the vehicle as well and informed him that he was receiving conflicting statements from the men. (*Id.* at 6:55–7:12). Next, Trooper Boetcher patted Williams down before placing him in the back of Deputy Gunnell's cruiser. (*Id.* at 7:12–9:30).

While both men sat detained in the cruisers, Deputy Gunnell began to run his canine, Cody. (Jt. Ex. 3, 8:05). Through Deputy Gunnell's body camera, Cody can first be observed sniffing the perimeter of the F-150. (*Id.* at 8:35–8:55). Upon completing a lap of the truck, Cody stops and begins to sniff the interior of the car through the passenger side door that was left ajar after Williams exited the vehicle. (*Id.* at 8:55–9:28). After about half a minute of Cody sniffing the interior of the passenger side door, floor, and seat area, Deputy Gunnell directed Cody to continue around the front of the car and back to the open door. (*Id.* at 9:28–9:43). Cody can be observed lingering at the open car door, sniffing, and shuffling his feet, before ultimately sitting briefly. (*Id.*). Deputy Gunnell can be heard telling Cody "Good boy" before leading him back to the cruiser. (*Id.* at 9:43–10:00). Deputy Gunnell then informed Trooper Boetcher that Cody indicated on the open car door. (*Id.* at 10:18–10:20).

Next, both Trooper Boetcher and Deputy Gunnell searched the entirety of the vehicle, including the luggage in the back. It was not until searching the truck bed that the officers discovered a large blue tarp, which once unrolled, resulted in the seizure of approximately 9 kilograms of cocaine. (ECF No. 54 at 7); (Jt. Ex. 3, 21:00–21:21).

**B. Procedural History**

The government filed a complaint against Williams on April 23, 2025, alleging conspiracy to possess with the intent to distribute at least 5 kilograms or more of cocaine in violation of Title 21, U.S.C. § 846. (ECF No. 1). Subsequently, on February 26, 2026, Williams was indicted for Conspiring to Distribute and Possess with the Intent to Distribute a Controlled Substance and Possession of a Controlled Substance with Intent to Distribute. (ECF No. 28). On April 6, 2026, Williams filed a Motion to Suppress, which the government responded to on April 17, 2026. (ECF No. 45, 52). The Court heard oral argument on the Motion to Suppress on July 21, 2026.

## II. LAW AND ANALYSIS

### A. Pretextual Traffic Stop

First, Williams argues that the traffic stop at issue was pretextual. While Trooper Boetcher informed Joe and Williams that they were pulled over for driving 74 miles per hour in a 65 mile per hour zone and because of an out-of-state license plate, Williams notes that a ticket was never issued, nor is there proof that the speed at which he was travelling was unreasonable for the conditions. (ECF No. 45 at 2). Further, Williams highlights that both men produced valid identification, and Joe produced proof of insurance. Despite such, both men were subject to search of their persons and detained in separate cruisers while the officers searched the truck and truck bed. Williams argues that this alone indicates there was an ulterior motive for the stop, given that this procedure has nothing to do with the alleged traffic violation. Further, Williams argues that the presence of the canine team at the location of the stop corroborates pretext. (*Id.* at 3). He also argues that there was ample time and information available during the stop for the officers to obtain a search warrant for the vehicle, yet the officers did not do so. (*Id.* at 2).

The Government counters that it is well-settled law that a vehicle may be stopped, and its occupants temporarily detained, where there is reasonable suspicion that criminal activity may be afoot or where there is probable cause that a traffic violation has occurred. (ECF No. 54 at 7). The Government contends that Trooper Boetcher's observation of the vehicle traveling at 74 miles per hour in a 65 miles per hour zone alone was sufficient grounds to initiate the traffic stop. (*Id.* at 8).

Given that Williams does not dispute that Joe was speeding, and that speeding is a violation of Ohio law, this Court finds that the initial stop of the F-150 was valid. *See Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Akram*, 165 F.3d 452, 460 (6th Cir. 1999)ك (Guy, J., dissenting)("Legally, the police can now stop a vehicle for any alleged traffic violation

and, while the vehicle is stopped, subject it to a canine sniff or hold the vehicle until a dog arrives on the scene."). It is not dispositive that the subjective motive of the officers may have been to search for drugs; case law supports that where an officer has probable cause to believe a traffic violation has occurred, the stop is warranted. *Akram*, 165 F.3d at 455 (citing *Whren,* 517 U.S. at 806; *United States v. Ferguson,* 8 F.3d 385, 392–93 (6th Cir. 1993)). Thus, this Court does not find that the stop was pretextual.

### B. Use of Canine[1]

Second, Williams contends that the "free-air-sniff" conducted by Cody was the exact sort of physical intrusion barred by the Supreme Court in *Florida v. Jardines*, and therefore the contraband found during the search should be suppressed. Williams also argues that Cody, Deputy Gunnell's canine, did not "indicate" until after he was urged to sniff the interior of the truck through the passenger side car door that was left ajar by Trooper Boetcher. (ECF No. 45 at 5). In opposition, the Government contends that use of the canine was warranted given the various conflicting statements Joe and Williams gave Trooper Boetcher which formed his basis for reasonable suspicion, including:

- Joe stating that he picked up the rental vehicle the previous night at the Houston airport;
- Joe stating that he drove directly from Houston to Ohio, a distance of over 1000 miles, to pick up Williams from the airport – instead of flying together or actually driving together;
- Williams stating that he flew to Ohio the day before; and

[1] In his initial Motion to Suppress Williams challenged the qualifications of Deputy Gunnell and Cody arguing that they both lacked proper training, and even if they were properly trained, Cody did not alert properly. (ECF No. 45 at 5). At the suppression hearing, counsel indicated that it was abandoning such arguments, thus this Court will not address such arguments herein.

- Joe stating that one piece of luggage in the truck bed was his, while Williams stated both pieces of luggage belonged to him.

As a threshold matter, *Florida v. Jardines* is inapposite. In *Florida v. Jardines*, the Supreme Court considered whether the use of a drug-sniffing dog on a homeowner's porch constituted a search. 569 U.S. 1, 3 (2013). The Supreme Court held that a homeowner has a reasonable expectation of privacy in the "curtilage" or the area adjacent to the home in which the activity of home life extends. *Id.* at 7. Here, Williams was subject to a traffic stop on a public road for speeding. One's reasonable expectation of privacy on a public road is not analogous to that at one's home. Additionally, the Supreme Court has reasoned that a dog sniff on the outside of a car is not a violation of the Fourth Amendment. *See Illinois v. Caballes,* 543 U.S. 405, 409 (2005). Thus, *Jardines* is inapplicable. *United States v. Seybels,* 526 Fed. App'x 857, 859 n. 1 (10th Cir. 2013) ("The recent decision in *Florida v. Jardines* ... was based on property rights not implicated in the traffic stop context and, hence, did not undermine *Caballes*."); *United States v. Cordero,* 2014 WL 3513181, at *9 (D. Vt. July 14, 2014) ("*Jardines* did not reverse the Court's decisions holding that canine sniffs during traffic stops do not implicate the Fourth Amendment....").

While a "free-air" canine sniff does not violate the Fourth Amendment, there must be a basis for law enforcement to prolong a traffic stop and initiate the use of the canine. That is, a lawful traffic stop may become unlawful "if it is prolonged beyond the time reasonably required to complete that mission." *Caballes,* 543 U.S. at 407. Law enforcement officers are instructed to use "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). The Sixth Circuit has also reasoned that "a seizure can be extended if 'something happened during the stop to cause the officer to have

a reasonable and articulable suspicion that criminal activity is afoot.'" *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) (quoting *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012)). Here, Williams and Joe gave conflicting and implausible accounts regarding their travel plans, which can form the basis for reasonable suspicion. *See United States v. Hill*, 195 F.3d 258, 272 (6th Cir. 1999) (finding reasonable suspicion where defendants provided inconsistent stories regarding their travel itinerary, including the length of the trip); *see also Stepp*, 680 F.3d at 662 (finding reasonable suspicion where the driver and passenger did not know the name or location of their destination, a gym, despite being less than an hour away from it). Trooper Boetcher was equipped with information that Williams had just departed from the Cincinnati Airport. Thus, Mr. Joe's statements regarding the two men driving together from Texas raised immediate red flags. Even without knowing Williams had just landed at the airport, Joe's explanation that the men had travelled from Houston to Columbus the night before, taking a few stops to nap, raised additional suspicion as the trip is nearly an 18-hour journey without stopping. Additionally, the men gave differing statements about whose luggage was in the back of the truck. These conflicting statements during the traffic stop alone amounted to reasonable suspicion, but such information coupled with what Trooper Boetcher already knew from the prior investigation regarding Mr. Williams strengthened the basis.

Even more damaging to Williams's arguments is that the case law he cites in his supplemental briefing favors the Government. Williams relies on *United States v. Thengkamp* to argue that Trooper Boetcher abandoned the traffic stop immediately after receiving the driver's licenses of Joe and Williams and lacked the required additional reasonable suspicion needed to initiate the canine sniff. (ECF No. 78 at 1). In *Thengkamp*, the district court reviewed the magistrate judge's analysis of whether an officer unreasonably prolonged a traffic stop when he detained the

defendants and conducted a dog sniff of the vehicle. 2025 WL 2803764, at *3 (E.D. Ky. Oct. 2, 2025). The magistrate judge applied the Sixth Circuit's standard in *United States v. Whitley*, 34 F.4th 522, 526-527 (6th Cir. 2022), which held that where law enforcement abandons a traffic stop, an officer must do so based on independent reasonable suspicion. *Thengkamp*, 2025 WL 2803764, at *3. Ultimately, the district court adopted the magistrate judge's ruling that while the officer undoubtedly abandoned the traffic stop when he detained the men to investigate drug activities, and never returned to the traffic stop, such was based on specific and articulable facts that considered in totality, amounted to additional reasonable suspicion. *Id.* at 3–5. The facts relied on by the officer included that:

> (1) Defendants gave inconsistent stories about their travel plans; (2) there was not enough luggage in the car for the trip from Michigan to Florida; (3) Defendants took a one-way flight to Michigan with a plan to return to Florida in a rental car; (4) Defendants had outstanding warrants, one of which was for drug trafficking; (5) Defendants were nervous during the traffic stop; (6) Defendant Thengkamp drove carelessly; (7) Defendant Thengkamp could not produce his driver's license; and (8) Defendant Thengkamp had an issue with his tooth.

*Id.* Thus, the district court judge affirmed the magistrate's ruling that the totality of such facts constituted additional reasonable suspicion, and the stop did not present a Fourth Amendment violation.

Williams is correct that *Thengkamp* directs courts to look at what the police did during the stop and whether it related to the purpose of the traffic stop. *See United States v. Thengkamp*, E.D. Ky., 2025 U.S. Dist. LEXIS 196367, at *17 (E.D. Ky. Aug. 29, 2025)(report and recommendation of Smith, Mag. J.). Further, the case validates that officers need additional reasonable suspicion to prolong a traffic stop once abandoning the initial traffic stop; however, as indicated by *Thengkamp*, such reasonable suspicion was present here. It was not unreasonable and outside the scope of the traffic violation for Trooper Boe4tcher to inquire about where the men were coming from and

where they were headed. In response to the questions, Joe and Williams gave Trooper Boetcher conflicting statements regarding their travel, their luggage, and whether they flew or drove from Houston. Additionally, Trooper Boetcher was equipped with information from the investigation into Williams which further heightened his reasonable suspicion. Thus, this Court finds that Trooper Boetcher and Deputy Gunnell had independent reasonable suspicion to initiate use of the canine.

Next, this court must address whether a Fourth Amendment violation was committed during the canine sniff. While a canine sniff is generally not a search, a Fourth Amendment violation does occur where law enforcement did something to encourage, or in some way facilitated, a canine's physical intrusion inside a car. *United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012). Here, prior to the search Trooper Boetcher instructs Williams to keep his hands in the air and orders him to exit the vehicle. (Jt. Ex. 2, at 6:31–6:32). Then, Trooper Boetcher opens the car door himself, conducts a search of Williams's person, and never closes the car door. (*Id.* at 6:32–9:30). After Williams and Joe are both detained in the cruisers, Deputy Gunnell instructs Cody to begin sniffing the vehicle. Cody does so and sticks his head inside the passenger side floor area through the open car door. (Jt. Ex. 3, at 8:35–9:46). Thus, two questions remain: (1) whether the sniff constituted a Fourth Amendment violation where Trooper Boetcher opened and left the car door ajar himself; and (2) whether Deputy Gunnell encouraged Cody physically to intrude the car?

The Sixth Circuit recently considered a similar issue in *United States v. Johnson*. In *Johnson*, officers had received two tips that the defendant and her husband were dealing drugs from their home. 2024 WL 1956209, at *1 (6th Cir. May 3, 2024). As a result of the tips, an officer drove to the property where he observed the defendant slumped over in the passenger side seat of a truck. After observing for about twenty minutes, the officer approached, assuming the defendant might

need medical attention, and called an ambulance and backup. After the ambulance conducted its initial examination of the defendant, she exited the vehicle, leaving the door ajar. It was at this point that another officer led a drug-sniffing canine around the perimeter of the truck. The canine gave two positive alerts and partially entered the cab of the vehicle through driver side door that was left open after each alert. As a result of the positive alerts, the officers searched the vehicle and retrieved a purse containing narcotics from the passenger floor. *Id.*

In a subsequent motion to suppress, the defendant argued that the sniff was unreasonable because the police purposefully left the truck door open, allowing the canine impermissibly to enter the vehicle. *Id.* at 3. The Sixth Circuit rejected the defendant's argument, reasoning that the defendant relied on a distinguishable out-of-circuit case in which "the officers themselves opened the [car] door" prior to the sniff, whereas in the case before them, "the officers had a reasonable suspicion that drugs would be found in the car, and they did not open the truck door." *Id.* (citing *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998)). The Sixth Circuit also reasoned that it knew of no authority requiring officers to close car doors before performing a drug sniff. *Id.*

Here, unlike in *Johnson*, Trooper Boetcher was the one who opened the truck door prior to the canine sniff. Thus, while the officers may have had reasonable suspicion to request that Williams exit the vehicle, their conduct is the reason the car door was left open prior to the canine sniff. Even so, as the Sixth Circuit acknowledged, there is no duty that Trooper Boetcher or Deputy Gunnell close the car door prior to initiating the canine sniff. Thus, this Court does not find this case to be materially distinguished from *Johnson*.

Notably, however, the analysis does not end there. This Court also must look to what happened after the door was left open. *Sharp*, 689 F.3d at 619 (citing *Winningham*, 140 F.3d at 1331) ("[A]

dog sniff from the inside of a vehicle becomes a search that violates the Fourth Amendment when "'the officers themselves opened the door' **and** '*facilitate[d]* a dog sniff of the van's interior.'") (emphasis added). During Cody's lap of the vehicle, Deputy Gunnell repeatedly dragged his hand along the trim of the car while walking backwards to guide Cody around the perimeter of the car. At the suppression hearing, Deputy Gunnell explained that during sniffs he repeatedly keeps his feet moving so that Cody is not encouraged by his behavior to linger in one place. He further testified that he began to observe behavior changes from Cody as he sniffed the perimeter of the door frame such as shuffling his feet and looking from the source of the smell to Deputy Gunnell and back. While Deputy Gunnell can be observed repeatedly motioning for Cody to sniff in the same area, it is not a different motion as to what he did to initiate the search and only occurred after Cody's behavior changes became evident on the body camera. Thus, this Court does not observe any conduct from Deputy Gunnell that led Cody to linger at the open car door or to physically intrude inside the vehicle. *United States v. Fellmy*, 165 F.4th 501, 506 (6th Cir. 2026), cert. denied, 224 L. Ed. 2d 512 (Apr. 20, 2026) (finding officers did not impermissibly interfere where "officers signaled for [the canine] to jump onto the door by patting the windowsill, [but] they never patted inside the car or provided any other signal for her to explore the car's interior."); *Cf. United States v. Mitchell*, 2013 WL 4041869, at *9 (E.D. Mich. Aug. 8, 2013) (finding a canine sniff violated the Fourth Amendment where officers opened the car door themselves, brought the canine to the open door, released the canine, and instructed the canine to "go get it," which resulted in the canine jumping inside the car and indicating). Additionally, where a dog only partially and briefly pokes their head into the interior of a vehicle, as Cody did here, such does not constitute a search. *Fellmy*, 165 F.4th at 506 (citing *Caballes*, 543 U.S. at 408–09) (finding a dog partially poking their head through an open window was not a search). Thus, this Court finds that Trooper

Boetcher and Deputy Gunnell had reasonable suspicion to initiate use of the canine and did not violate the Fourth Amendment by doing something to encourage or in some way facilitate Cody to physically intrude the vehicle.

**C. Flight Records**

Williams also argues that the Government's use of "flight watch" subpoenas over a three-month period violated his privacy rights and were unlawful searches and seizures. (ECF No. 45 at 8). Williams contends that the subpoenas were overly broad, sought records for travel arrangements that had yet to occur, were directed at the most popular Columbus airlines, and were for 90 days. *Id.* In response, the Government contends that Williams lacks standing to challenge administrative subpoenas issued to third parties. (ECF No. 54 at 13). Specifically, the Government contends such subpoenas are within the authority of law enforcement under 21 U.S.C. § 876 which provides that "'[i]n any investigation relating to [the Attorney General's] functions … with respect to controlled substances,' the Attorney General may 'require the production of any records which the Attorney General finds relevant or material to the investigation.'" (*Id.*).

In *United States v. Moffett*, the Government used administrative subpoenas to obtain passenger lists and reservations form Amtrak for various train stops in Albuquerque, New Mexico. 84 F.3d 1291, 1292 (10th Cir. 1996). The Tenth Circuit held that the defendant in that case had no reasonable expectation of privacy in the train manifest, a business record of Amtrak, and did not have standing to contest evidence obtained through administrative subpoenas issued to third parties *Id.* at 1293–94. The Sixth Circuit reaffirmed this principle in *United States v. Phibbs*, finding that the defendant lacked standing to challenge the administrative subpoenas issued to third-party businesses to obtain his credit card statements and telephone records, in which he did not have a justifiable privacy interest. 999 F.2d 1053, 1077 (6th Cir. 1993).

Here, Williams fails meaningfully to distinguish this case from *Moffett* or *Phibbs*. Williams merely raises that the "flight watch subpoenas" used here were substantially intrusive and were authorized for 90 days instead of one month like the lists in *Moffet*. Williams cites no case law supporting that a 90-day subpoena of flight records is overly invasive.[2] He merely attempts to construe the flight log subpoena as equivalent to the cell site location information (CSLI) deemed to require a warrant in *Carpenter v. United States*, 585 U.S. 296, 312–13 (2018). Notably, in *Carpenter*, the Supreme Court reasoned that CSLI was pervasive, not affirmatively shared, and provided "a detailed chronicle of a person's physical presence compiled every day, every moment, over several years." *Id.* at 315. CSLI is distinct from the flight records at issue here. The flight records do not provide an extensive chronicle of Williams's movements at each moment of the day. Rather, the flight records document the willful purchase of ticket that indicates where Williams may have been traveling on a specific date and time. Such is nowhere near as comprehensive or intrusive as the information at issue in *Carpenter*.

This Court's analysis is the same regarding Williams's arguments the Supreme Court's recent decision in *Chatrie v. United States*, 2026 WL 1855568, at *4 (U.S. Jun. 29, 2026), which held that use of a geofence warrant to access one's location history data constituted a search under the Fourth Amendment. In *Chatrie*, the police issued a geofence warrant to Google to obtain access to all Google users with location history enabled in the vicinity of a bank robbery. *Id.* Similarly to *Carpenter*, the Supreme Court reasoned that "[a]n individual has a reasonable expectation of privacy in records about his cell phone's location, and police intrude on that constitutionally

[2] Williams argues that the concurrence of Justices Alito, Ginsburg, Breyer, and Kagan in *United States v. Jones*, reasoning that 28 days of GPS monitoring was problematic supports a finding that the 90-day subpoenas here constituted prolonged tracking. (ECF No. 78 at 5) (citing *United States v. Jones*, 565 U.S. 400, 429 (2012). As discussed further below, GPS or cell site location tracking where law enforcement agents track every movement that one makes in driving a vehicle or based on their cell phone is distinct from obtaining the finite and non-exhaustive details of an airline ticket.

protected interest when they demand the information—even though for only a limited time, and from a third-party tech company." *Id.* Thus, the Court held that "[w]hen the government 'accesses historical cell phone' location information—Location History as much as CSLI—it 'conducts a search under the Fourth Amendment.'" *Id.* at *16 (citing *Carpenter*, 585 U.S. at 300). Again, this Court finds the flight records sought in this case to be entirely distinct from the exhaustive and intimate location data at issue in *Chatrie* and *Carpenter*.

The underlying principle in *Moffett* was that the defendant had no reasonable expectation of privacy in the information on the train manifest which was a business record of Amtrak. Similarly, Williams has no reasonable expectation of privacy in the flight plans he willingly shared with the airlines. Williams additionally fails to demonstrate how his case differs from the Sixth Circuit's analysis in *Phibbs*. Because Williams has no expectation of privacy in the airline flight logs, and the administrative subpoenas were directed at the airlines and not him, he has no standing to challenge the subpoenas.

**D. CSLI Records**

Finally, Williams contends that the Government's use of cell phone location data violated his Fourth Amendment rights. (ECF No. 45 at 8). Williams contends that the Government failed to state a credible basis for probable cause to believe a crime has been committed in its applications for the installation and operation of a pen register and trap and trace device on Williams's cell phone and for the release of cell tower and phone records. (*Id.* at 9). Williams specifically cites that the device warrants lack corroboration and fail to "tie the facts in the affidavit to show that the tracking device/cell site location information is evidence of a crime." (*Id.* at 9).

In opposition, the Government contends that DEA Special Agent Brandon Burnham submitted an affidavit detailing the February 2025 surveillance incident in which he observed Williams

meeting at a residence with a known drug-trafficker, then observed him travel to the airport, drop off a "ghost bag," and then leave the airport without ever boarding his flight. (ECF No. 54 at 15). SA Burnham also noted that in route to the airport, Williams pulled onto the shoulder of the highway, which the Government contends is a move "commonly utilized by drug traffickers when evading the police." (*Id.* at 15). The Government argues that a review of the totality of the circumstances in SA Burnham's affidavit was sufficient to establish probable cause for the warrants. In the event that this Court finds that the affidavit failed to establish probable cause, however, the Government contends that the good faith exception shall apply.

To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate "a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Loggins,* 777 F.2d 336, 338 (6th Cir.1985) (quoting *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). While Williams takes issue with a lack of corroboration in certain parts of SA Burnham's affidavit regarding "information" he allegedly received on Williams, such argument ignores that the crux of the affidavit rests on SA Burnham's firsthand observations of Williams. SA Burnham attests in detail to his surveillance of Williams and the multiple pieces of evidence leading him to believe Williams was engaged in criminal conduct. *See United States v. Jones*, 817 F.3d 489, 491 (6th Cir. 2016) (finding and agent's own firsthand observations of drug activity that corroborated a tip from an informant constituted probable cause). SA Burnham observed Williams meeting with a known drug-trafficker at a residence, witnessed him drop off a duffle bag and retrieve a suitcase from the residence, watched Williams leave said residence, and observed odd driving behaviors such as Williams pulling over on the side of the highway on the way to the airport where he checked the

suitcase without ever boarding the flight. Considering the totality of circumstances, SA Burnham's observations in connection with information from the informant established probable cause.

Even more damaging to Williams's assertions is that his arguments are blatantly devoid of case law. Williams merely attempts to reframe or provide context to his "suspicious" activities by citing that he only pulled over to get directions to the airport, or that he only checked his bag on the flight first and then left the airport to return his rental car as opposed to engaging in these behaviors to conceal drug activity. Notably, however, this Court need not opine on the veracity of such narratives, where SA Burnham obtained a warrant from the Franklin County Court of Common Pleas authorizing the use of GPS/Precision Location, and the release of customer records to a mobile device. (ECF No. 54-2). Under the good faith exception, the officers were entitled to rely on the court-issued warrants in good faith regardless of whether the affidavits genuinely demonstrated probable cause. *United States v. Leon*, 468 U.S. 897 (1984). Thus, this Court finds that the Government's use of cell phone location data, pen register, trap and trace device, and flight subpoenas did not violate Williams's Fourth Amendment Rights and there is no basis to suppress such evidence.

## III. CONCLUSION

For the reasons set forth above, Williams's Motion to Suppress (ECF No. 54) is **DENIED**.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATE: August 4, 2026**